# 25-1873

## United States Court of Appeals for the Second Circuit

———————————————

CAONAISSA WON,

*Plaintiff - Appellant,*

v.

AMAZON.COM SERVICES LLC,

*Defendant - Appellee.*

———————————————

On Appeal from the United States District Court
for the Eastern District of New York,
Case No. 1:20-cv-02811, Judge Nicholas G. Garaufis

## BRIEF FOR DEFENDANT-APPELLEE AMAZON.COM SERVICES LLC

Lauren M. Blas
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

Brian A. Richman
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100

Jason C. Schwartz
Zachary B. Copeland
GIBSON, DUNN & CRUTCHER LLP
1700 M Street NW
Washington, DC 20036
(202) 955-8500
jschwartz@gibsondunn.com

*Counsel for Defendant-Appellee
Amazon.com Services LLC*

## CORPORATE DISCLOSURE STATEMENT

Defendant-Appellee Amazon.com Services LLC is a Delaware limited liability corporation with its principal place of business in Seattle, Washington. The sole member of Amazon.com Services LLC is Amazon.com Sales, Inc., a Delaware corporation with its principal place of business in Seattle, Washington. The sole owner of Amazon.com Sales, Inc. is Amazon.com, Inc. Amazon.com, Inc. is a Delaware corporation with its principal place of business in Seattle, Washington. Amazon.com, Inc. does not have a parent company, and no publicly held corporation owns 10% or more of Amazon.com, Inc.'s stock.

Dated:      February 11, 2026

/s/ *Jason C. Schwartz*
Jason C. Schwartz

i

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................1

ISSUES PRESENTED ..................................................................3

PERTINENT STATUTORY PROVISIONS ..............................4

STATEMENT OF THE CASE .....................................................6

    A.    Won Is Hired to Work a Fixed Schedule ...............................6

    B.    Won Immediately Seeks a Permanent Schedule
        Change That Amazon Does Not Offer to Any Employee........7

    C.    Won Violates a Clear Safety Policy and Is Terminated .........9

    D.    Won Sues Amazon Multiple Times, and the District
        Court Rejects Each Claim......................................................12

SUMMARY OF THE ARGUMENT ..........................................15

STANDARD OF REVIEW ........................................................18

ARGUMENT .............................................................................18

I.    The Human Rights Law Does Not Require Employers to
    Provide Scheduling Accommodations for Caregiver Status..........19

II.    Won's Discrimination Theory Fails ...............................................22

    A.    Won Was Not Treated "Less Well" Than Other
        Employees............................................................................23

    B.    Won's Remaining Objections Do Not Suggest Unequal
        Treatment............................................................................31

CONCLUSION ..........................................................................37

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Altman* v. *N.Y.C. Health & Hosps. Corp.*,
100 F.3d 1054 (2d Cir. 1996) .............................................................. 18

*AMG Cap. Mgmt., LLC* v. *FTC*,
593 U.S. 67 (2021) .............................................................................. 30

*Anderson* v. *Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................ 18

*Bostock* v. *Clayton County*,
590 U.S. 644 (2020) ............................................................................ 26

*Chaplin* v. *Permission Data, LLC*,
2022 WL 2916778
(N.Y. Sup. Ct., N.Y. Cnty. July 25, 2022) .................................... 26, 27

*Collymore* v. *City of New York*,
2025 WL 1323784 (2d Cir. May 7, 2025) ........................................... 32

*Com. Union Ins. Co.* v. *Alitalia Airlines, S.p.A.*,
347 F.3d 448 (2d Cir. 2003) ............................................................... 18

*Commonwealth of N. Mar. I.* v. *Canadian Imperial
Bank of Com.*,
990 N.E.2d 114 (N.Y. 2013) ............................................................... 21

*State Div. of Hum. Rts. ex rel. Cottongim* v. *Cnty. of
Onondaga Sheriff's Dep't*,
524 N.E.2d 123 (N.Y. 1988) ............................................................... 33

*Doe* v. *Chao*,
540 U.S. 614 (2004) ............................................................................ 21

*Emamian* v. *Rockefeller Univ.*,
971 F.3d 380 (2d Cir. 2020) .......................................................... 22, 25

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Gittens-Bridges* v. *City of New York*,
2023 WL 8825342 (2d Cir. Dec. 21, 2023)................................................31

*Golston-Green* v. *City of New York*,
184 A.D.3d 24 (N.Y. App Div. 2d Dep't 2020)....................................33

*Hamdan* v. *Rumsfeld*,
548 U.S. 557 (2006).................................................................................22

*Mississippi ex rel. Hood* v. *AU Optronics Corp.*,
571 U.S. 161 (2014).................................................................................20

*Huntley* v. *City of New York*,
2024 WL 3070013
(N.Y. Sup. Ct., N.Y. Cnty. June 20, 2024) ...................................35, 36

*Ibhawa* v. *N.Y. State Div. of Hum. Rts.*,
252 N.E.3d 1118 (N.Y. 2024) ...............................................................34

*INS* v. *Cardoza-Fonseca*,
480 U.S. 421 (1987)................................................................................20

*Kuzmich* v. *50 Murray St. Acquisition LLC*,
132 N.E.3d 624 (N.Y. 2019) ................................................................35

*Lent* v. *City of New York*,
209 A.D.3d 494 (N.Y. App. Div. 1st Dep't 2022)..............................31

*Loper Bright Enters.* v. *Raimondo*,
603 U.S. 369 (2024)................................................................................21

*Mihalik* v. *Credit Agricole Cheuvreux N.A., Inc.*,
715 F.3d 102 (2d Cir. 2013) ...........................................................31, 33

*Palmer* v. *Cook*,
65 Misc. 3d 374 (N.Y. Sup. Ct., Queens Cnty. 2019)...................35, 36

*Phillips* v. *City of New York*,
66 A.D.3d 170 (N.Y. App. Div. 1st Dep't 2009).................................19

iv

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Rivers* v. *Birnbaum*,
102 A.D.3d 26 (N.Y. App. Div. 2d Dep't 2012)....................................20

*Tihan* v. *Apollo Mgmt. Holdings, L.P.*,
201 A.D.3d 557 (N.Y. App. Div. 1st Dep't 2022)................................32

*Wang* v. *James*,
227 N.E.3d 323 (N.Y. 2023) ...............................................................33

*Won* v. *Amazon.com Servs. LLC*,
2025 WL 2962616 (Oct. 21, 2025) .....................................................15

## Statutes

N.Y.C. Admin. Code § 8-107.................................................... 4, 5, 20, 26

## Rules

Fed. R. Civ. P. 56 ................................................................................18

## Other Authorities

Int. 0780-2024 ....................................................................................30

N.Y.C. Comm'n on Hum. Rts., *The Law*,
https://www.nyc.gov/site/cchr/law/the-law.page..............................19

N.Y.C. Council, Comm. on C.R., Tr. of Minutes
(Sept. 21, 2015), https://perma.cc/3EHF-7GL3.................................21

**INTRODUCTION**

Appellant Caonaissa Won asks the Court to do what the New York City Council refused to do: require employers to provide individualized work schedules for caregivers. The statute does not impose that requirement, the City Council considered and rejected it, and the district court correctly declined to create it by judicial decree.

The facts are undisputed. Won was hired as an hourly fulfillment associate at Amazon's large, shift-based Staten Island facility, where thousands of employees perform interdependent tasks on tightly coordinated schedules. Within days of starting work, she asked Amazon to permanently alter her assigned shift—to arrive fifteen minutes late and leave fifteen minutes early multiple days per week while maintaining full pay by working through paid breaks. That schedule change would mean that Won would regularly miss shift-opening stand-up meetings, disturb end-of-shift transitions, and work alone on the warehouse floor while other employees took breaks. Amazon denied the request under neutral, written scheduling and compensation rules that do not permit that disruptive arrangement for any employee.

1

Amazon does offer limited, temporary schedule adjustments for specific, in-policy reasons—such as a religious observance—and those options were available to Won on the same terms as to everyone else. But she did not seek an in-policy temporary adjustment. She sought a permanent, out-of-policy schedule that Amazon provides to no one.

Months later, after her scheduling request had already been denied and following an unrelated period of military leave, Won entered the facility on a day she was not scheduled to work and used her badge to bring her young son past the same secure entry point—twice on that day, and once after being expressly told he could not be inside. That conduct violated Amazon's safety and security rules for an industrial workplace and resulted in immediate termination.

After her termination, Won sued Amazon on a wide array of theories, including discrimination and retaliation based on military service and caregiver status. After full discovery, the district court rejected each of her claims. Won now appeals only a single ruling.

On appeal, Won does not dispute that the New York City Human Rights Law does not require employers to provide caregiver scheduling accommodations. Instead, she argues that the denial of her requested

2

accommodation was discrimination in the "terms, conditions, or privileges of employment." That pivot fails. The Human Rights Law guarantees equal access to benefits an employer actually provides; it does not require employers to create new, individualized scheduling arrangements or to extend limited, policy-defined exceptions beyond their scope. The City's own guidance—cited by Won—confirms that the law "does not require employers to make special accommodations to caregivers outside the scope of company policy." Won Appendix ("A") 629.

Put simply: Won asked for a permanent schedule change Amazon does not give anyone. Any employee—caregiver or not—seeking the same permanent, out-of-policy change would have been denied for the same reason. Because Won's caregiver status made no difference to the outcome, there is no actionable discrimination under the Human Rights Law, and the district court's judgment should be affirmed.

## ISSUES PRESENTED

I.  Won sought a permanent, individualized change of her work schedule to accommodate childcare. Did the district court correctly hold that the New York City Human Rights Law does not require employers to provide such accommodations based on caregiver status?

3

II.     Won requested a schedule change that Amazon does not provide to any employee and otherwise had access to the same terms, conditions, and scheduling options as all other employees. Did the district court correctly grant summary judgment on Won's alternative theory—namely, that she failed to show that she was treated "less well" in the terms, conditions, or privileges of employment because of caregiver status?

## PERTINENT STATUTORY PROVISIONS

1.     New York City Administrative Code § 8-107(1) provides, in relevant part:

*Employment.* It shall be an unlawful discriminatory practice:

(a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, sexual and reproductive health decisions, sexual orientation, uniformed service, height, weight, or immigration or citizenship status of any person:

(1) To represent that any employment or position is not available when in fact it is available;

(2) To refuse to hire or employ or to bar or to discharge from employment such person; or

(3) To discriminate against such person in compensation or in terms, conditions or privileges of employment.

**2.**     New York City Administrative Code § 8-102 defines "reasonable accommodation" as follows:

> The term "reasonable accommodation" means such accommodation that can be made that does not cause undue hardship in the conduct of the covered entity's business.

**3.**     Section 8-107 contains the following provisions regarding reasonable accommodation:

- "[T]he employer shall make reasonable accommodation to the religious needs of such person." N.Y.C. Admin. Code § 8-107(3)(a).

- "[I]t is an unlawful discriminatory practice . . . not to provide a reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job." N.Y.C. Admin. Code § 8-107(15)(a).

- "It shall be an unlawful discriminatory practice for an employer to refuse to provide a reasonable accommodation, as defined in section 8-102, to the needs of an employee for the employee's pregnancy, childbirth, or related medical condition." N.Y.C. Admin. Code § 8-107(22)(a).

- "[I]t is an unlawful discriminatory practice . . . not to provide a reasonable accommodation to enable a person who is a victim of domestic violence, or a victim of sex offenses or stalking to satisfy the essential requisites of a job." N.Y.C. Admin. Code § 8-107(27)(b).

5

## STATEMENT OF THE CASE

### A.    Won is Hired to Work a Fixed Schedule

This case arises from Plaintiff Caonaissa Won's brief employment at Amazon's Staten Island fulfillment center, known as "JFK8." A37; A66; A695. JFK8 is a large, continuous, 24-hour operation employing approximately 6,000 associates. A20 ¶¶ 1, 3; *see* A150:9–15; A695. Employees work in coordinated, overlapping shifts, with hundreds of—often approaching 1,000—associates assigned to a given shift at the same time. Appellee's Supplemental Appendix ("ASA") 007:6–8. Those associates perform fulfillment functions in a fast-paced environment involving moving machinery, conveyor systems, and powered industrial equipment. *See* A20 ¶ 1; A212:16–21; A255:20; A257:4–12; A262:10–17; A695.

Work at JFK8 is organized around teams of associates performing interdependent tasks simultaneously (A256–57), such as receiving inventory, picking items, packing orders, and moving products along conveyor systems (A20–21 ¶¶ 1, 3). This work requires employees on a shift to be present and working (or taking breaks) at the same time. *See* A256–57. Employees also meet together with their manager at the beginning of each shift. A150.

Won—a single mother and active-duty member of the U.S. Army Reserves—worked at JFK8 as an hourly fulfillment associate from July 1, 2019 to September 6, 2019. A37 ¶ 15; A93–94 ¶¶ 39, 40–44. Fulfillment associates are hired to work fixed schedules as part of JFK8's shift-based operations. A257:4–12. The job posting for Won's position states that applicants "must be willing and able to work all shifts." ASA025. Consistent with that requirement, Won was hired into a standard schedule of four ten-hour shifts per week—Mondays, Tuesdays, Wednesdays, and Sundays—with one thirty-minute unpaid meal break and two fifteen-minute paid rest breaks per shift. A97 ¶¶ 63–64. That schedule aligned her work with the overlapping schedules of other associates on her team and throughout the facility. A256–57. Employees at JFK8 are not permitted to work outside their assigned shifts (*see* A233:3–12), and permanent, ad hoc individual scheduling deviations are not allowed (*see* Won Sealed Appendix ("SA") 14–19).

## B. Won Immediately Seeks a Permanent Schedule Change That Amazon Does Not Offer to Any Employee

"[I]mmediately" after beginning employment, Won asked Amazon to permanently change her assigned schedule so that she could transport her then-seven-year-old son to and from school. A23–24 ¶ 13; A97 ¶ 60.

Specifically, she requested permission to arrive fifteen minutes late and leave fifteen minutes early three days per week, while working through paid breaks to make up the time. A97–98 ¶¶ 63–65. The requested change would have required Amazon to permit Won to work outside the facility's fixed shift structure and on terms not available to other employees.

Amazon denied the request. A23–24 ¶ 13. Human Resources personnel informed Won that the requested permanent schedule change was not permitted. A23–24 ¶¶ 13–14. Schedule-modification requests at JFK8 are governed by Amazon's Temporary Schedule Adjustments Policy, which permits only limited, short-term timing adjustments for specified reasons, such as religious observance. A28–29 ¶¶ 34–35; *see* SA14–19. Those adjustments are confined to modest adjustments to the start or end time of an associate's assigned shift, do not permit employees to work outside their shift or through breaks, and "may impact an employee's compensation." SA15–16.

Consistent with that policy, Amazon explained to Won that while temporary schedule adjustments might be available, a permanent change to accommodate her child's school schedule was not permitted.

8

A28–29 ¶¶ 35–36; *see also* A23–24 ¶ 13.  In any event, the specific arrangement Won sought—altering shift start and end times by working through paid breaks while maintaining full pay—was not a schedule change Amazon offered to any fulfillment associate at JFK8, for any reason.  *See* SA14–19.

### C.   Won Violates a Clear Safety Policy and is Terminated

Months later, after her request had already been denied and following an unrelated period of military leave, Won returned to JFK8 on September 6, 2019—a day she was not scheduled to work.  A22–23 ¶¶ 10–12.  Won testified that she came to the facility to provide Human Resources with documentation relating to her child's school schedule in connection with her previously denied request for a permanent schedule change.  A23–24 ¶¶ 12–13.  By that point, however, Human Resources had already informed Won—more than once—that the requested permanent schedule change was "'impossible.'"  Won Br. 5; *see* A28–29 ¶¶ 35–36.

Won arrived that day with her son and used her access badge to bring him through a secure entrance into the facility.  A23 ¶ 12.

Employees at JFK8 are instructed that only authorized personnel may enter the facility.   Amazon stresses to employees that they

"shouldn't bring anybody else into the building" (A208:6–9), and when Won joined Amazon she received an access card with explicit written instructions that it "[m]ust not be used to allow another person to enter" JFK8 (A21–22 ¶ 6). Consistent with those instructions, security personnel stopped Won, informed her that her child could not be inside the facility, and instructed her to wait outside. A24–25 ¶¶ 14, 17; *see* A233:20–24 (security "walked up to me and said that I couldn't be there with my son").

Despite that instruction, Won later used her badge to bring her son into the facility a second time that same day. A25 ¶ 18. Both entries violated Amazon's written safety policies barring access by unauthorized persons. A22 ¶ 7. Those policies reflect the operating conditions of the facility, which is designed for trained employees and includes heavy machinery operating throughout JFK8; continuously moving conveyor belts, pallets, and carts; personnel working on mezzanines reaching up to forty feet; and forklifts and pallet jacks traversing the warehouse floor. A20–21 ¶¶ 2–4, 6; A212:12–21. Because unauthorized entry "exposes the site to immediate risk of severe injury or financial loss," Amazon classifies an

10

unauthorized entry as a "Category 1 Security Infraction" subject to immediate termination. A22 ¶ 7.

Won admits that she violated this policy twice, including reentering the facility with her son after being expressly told that he was not permitted inside. A24–25 ¶¶ 14–18; *see* A197:21–24 ("Q. Did you reenter the facility through the revolving doors with your son a second time? A. I did.").

Two Human Resources employees responded to the incident. A25–26 ¶¶ 20–22. Each worked on a general Human Resources team responsible for all 6,000 JFK8 employees and had neither previously met Won nor known anything about her. ASA10:18–23; ASA20:23–21:3. After interviewing Won, they concluded that she had committed multiple Category 1 security infractions. A25–27 ¶¶ 21–28. Because Category 1 security infractions mandate immediate termination under Amazon's safety policy, Won's employment was terminated at that time. A27 ¶¶ 25–28. Amazon applies this policy uniformly: every other employee who has brought an unauthorized person into JFK8 has been terminated as well. A29 ¶¶ 37–38.

### D. Won Sues Amazon Multiple Times, and the District Court Rejects Each Lawsuit

Following her termination, Won filed two separate actions against Amazon, asserting a variety of claims under federal, state, and city employment statutes.

**1.** In this action, Won asserted multiple claims alleging that Amazon unlawfully terminated her employment and discriminated or retaliated against her based on military service and caregiver status. A43–48. She also alleged that Amazon violated the New York City Human Rights Law by denying her request for a "schedule accommodation"—a permanent, individualized change to her assigned work schedule to accommodate childcare. A38–39, 43 ¶¶ 26, 28, 31, 65. In her complaint, summary-judgment briefing, and Rule 56.1 submissions, Won characterized her schedule request as an "accommodation" more than forty times (*see, e.g.*, A38–39, 41, 42–43 ¶¶ 24, 26, 28, 29–32, 42, 44, 52, 65), though she now asserts on appeal that she "did not seek . . . an 'accommodation'" (Won Br. 10).

After discovery, the district court (Garaufis, J.) granted summary judgment to Amazon on all claims. A694. The court began with Won's termination-based discrimination and retaliation theories. It examined

12

the summary-judgment record and concluded that Amazon terminated Won for a "'legitimate, non-discriminatory' reason"—her violation of Amazon's Category 1 security policy. A716–17. The court found no evidence from which a reasonable jury could infer discriminatory or retaliatory intent. A707. To the contrary, the court explained that the evidence supporting Won's termination theories was "so 'slight' that no rational jury could find in her favor." *Id.*

The court then turned to Won's caregiver-scheduling claim. It treated the claim as a question of statutory interpretation and began with the text of the Human Rights Law. The court explained that although the statute expressly requires reasonable accommodations for certain protected traits, it contains no comparable accommodation requirement for caregiver status. A710–11. The court further noted that, when the City Council amended the Human Rights Law to add caregiver status, it expressly considered and rejected proposals that would have imposed a caregiver-accommodation obligation. *Id.* In light of that text and history, the court declined to "read a reasonable accommodation provision for caregivers into the NYCHRL where none exists." A711.

13

The court next examined Won's alternative theory under the statute's nondiscrimination provision. It explained that to prevail on that theory, Won was required to show that she was treated "less well" than other employees because of caregiver status. A704. On the undisputed record, the court found she could not do so. Amazon denied Won a permanent schedule change that it does not offer to any employee, caregiver or not. A708–09 & n.3. By contrast, the scheduling options Amazon does offer—such as temporary shift-start or shift-end adjustments that do not entail an employee working alone on the warehouse floor through paid rest breaks —were available to Won on the same terms as to everyone else. A711. Because Amazon's neutral scheduling policies did not deny Won access to any benefit provided to other employees, the court concluded that she was not treated "less well" because of her caregiver status. A713.

**2.** Separately, Won filed an action challenging Amazon's military-leave compensation policies. *See Won* v. *Amazon.com Servs. LLC*, No. 21-CV-2867 (E.D.N.Y. filed May 5, 2021). The district court (Garaufis, J.) dismissed that action after concluding that Won lacked Article III standing because she had not suffered a cognizable injury under

the challenged policy. *See Won* v. *Amazon.com Servs. LLC*, 2025 WL 2962616, at \*5 (Oct. 21, 2025). The court explained that standing turned on whether the challenged policy left Won financially worse off than other comparable leave policies. On the undisputed record, the court found that it did not. To the contrary, the court concluded that Won was "better off" under Amazon's military-leave policy than she would have been under the comparator policies she invoked and therefore hadn't suffered a concrete injury sufficient to confer standing. *Id.* at \*1. That dismissal is not addressed in Won's opening brief.

\*   \*   \*

Won now appeals only the dismissal of her New York City Human Rights Law caregiver-scheduling claim. *See* Won Br. 7 n.4 ("Won does not appeal the dismissal of her other claims.").

## SUMMARY OF THE ARGUMENT

The district court correctly granted summary judgment to Amazon because Won's caregiver-scheduling claim fails both as a matter of law and on the undisputed facts.

15

**I.**     The New York City Human Rights Law does not require employers to provide caregiver scheduling accommodations. Instead, it imposes accommodation duties only for enumerated protected traits such as disability, pregnancy, and religious observance. It does not impose any accommodation duty for caregiver status. When the City Council added caregiver status to the statute, it considered and rejected proposals that would have required employers to provide the kind of caregiving accommodation Won seeks here.

**II.**     Unable to identify any accommodation duty, Won pivots to a nondiscrimination theory, arguing that Amazon treated her "less well" in the terms, conditions, or privileges of employment. That theory fails, too.

**A.**     Won was not treated "less well" than other employees. Amazon applied the same scheduling rules to Won as to every other hourly employee. Amazon does not offer "flexible scheduling" that allows employees like Won to vary shift start and end times on a recurring basis, nor does it permit employees to arrive late or leave early for reasons outside its Temporary Schedule Adjustments Policy. The limited, temporary adjustments Amazon does offer—for specified, in-policy reasons such as

religious observance—were available to Won on the same terms as to everyone else. The permanent, full-pay, unique, arrive-late, leave-early, work-through-rest-break schedule change Won demanded is not a benefit Amazon provides to anyone. Because a non-caregiver seeking the same out-of-policy change would have been denied for the same reason, caregiver status made no difference to the outcome, and there is therefore not discrimination "because of" caregiver status.

**B.** Won's remaining arguments cannot supply the missing elements of her claim. The isolated workplace comments Won cites are not independently actionable and do not show discriminatory treatment or causation; they merely explained the application of neutral scheduling rules. Agency guidance and legislative history cannot override the statute's requirement that a plaintiff show unequal treatment because of a protected status—and in any event, both confirm that the Human Rights Law does not mandate caregiving accommodations outside company policy. Finally, generalized references to the "totality of the circumstances" and summary-judgment standards cannot substitute for the lack of any proof that Won was treated less well because of her caregiver status.

17

## STANDARD OF REVIEW

This Court reviews a district court's grant of a motion for summary judgment de novo. *Com. Union Ins. Co.* v. *Alitalia Airlines, S.p.A.*, 347 F.3d 448, 456 (2d Cir. 2003). Summary judgment is appropriate where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where "'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party,'" there is no genuine issue for trial. *Altman* v. *N.Y.C. Health & Hosps. Corp.*, 100 F.3d 1054, 1060–61 (2d Cir. 1996).

## ARGUMENT

The district court correctly granted summary judgment. The New York City Human Rights Law does not require employers to provide caregiver scheduling accommodations, and Amazon treated Won the same as every other employee under its scheduling policies.

18

## I. The Human Rights Law Does Not Require Employers to Provide Scheduling Accommodations for Caregiver Status

Won's claim fails at the threshold because it depends on an accommodation request the Human Rights Law does not require employers to provide. Won asked Amazon to make an ongoing, individualized change to her assigned work schedule so she could regularly arrive late and leave early to take her child to and from school while retaining full compensation. That is a request for an accommodation for caregiving.

Under New York City law, a reasonable accommodation is "any action, modification or forbearance that helps ameliorate . . . a need created by" a protected status. *Phillips* v. *City of New York*, 66 A.D.3d 170, 182 n.12 (N.Y. App. Div. 1st Dep't 2009). The City's guidance is even more direct, defining a reasonable accommodation to include "a change made to the work schedule" to address an employee's specific needs. N.Y.C. Comm'n on Hum. Rts., *The Law*, https://www.nyc.gov/site/cchr/law/the-law.page. As the district court explained, that is precisely what Won requested: a "deviat[ion] from" Amazon's "generally applicable policy" to address her childcare needs. A709 n.3. She litigated the case on that understanding below, repeatedly characterizing her request—more than

19

forty times—as an "accommodation" in her own papers. *See, e.g.*, A38–39, 41, 42–43 ¶¶ 24, 26, 28, 29–32, 42, 44, 52, 65.

The problem for Won is that the Human Rights Law does not require employers to provide scheduling accommodations for caregiving purposes. The statute's accommodation framework is explicit and limited. When the City Council intended to impose an accommodation obligation, "it explicitly said so." *Mississippi ex rel. Hood* v. *AU Optronics Corp.*, 571 U.S. 161, 169 (2014). Section 8-107 requires reasonable accommodations only for specific protected traits. For example, it makes it an unlawful discriminatory practice not to provide a reasonable accommodation for a known disability. N.Y.C. Admin. Code § 8-107(15)(a). It imposes comparable, express accommodation duties for pregnancy, religious observance, and domestic-violence victim status. *See id.* § 8-107(22), (27), (28).

Caregiver status appears in none of those provisions, and its omission is dispositive. Where the legislature "includes particular language in one section of a statute but omits it in another," courts presume the omission was intentional. *Rivers* v. *Birnbaum*, 102 A.D.3d 26, 36 (N.Y. App. Div. 2d Dep't 2012) (quoting *INS* v. *Cardoza-Fonseca*, 480 U.S. 421,

20

432 (1987)); *see also Commonwealth of N. Mar. I.* v. *Canadian Imperial Bank of Com.*, 990 N.E.2d 114, 117 (N.Y. 2013) ("[T]he failure of the legislature to include a term in a statute is a significant indication that its exclusion was intended.").

The statutory "history if anything only underscores" that the omission was deliberate. *Loper Bright Enters.* v. *Raimondo*, 603 U.S. 369, 393 (2024). When the City Council amended the Human Rights Law to prohibit discrimination on the basis of caregiver status, it did not merely remain silent on accommodation. It considered—and affirmatively "cut out"—the "very language" that would have required employers to provide caregivers with reasonable accommodations, including scheduling modifications. *Doe* v. *Chao*, 540 U.S. 614, 622 (2004). After hearing testimony and considering concerns about administrability and workplace disruption from such a "fundamental shift in workplace relations," the Council chose not to extend the Human Rights Law's accommodation framework to caregivers. N.Y.C. Council, Comm. on C.R., Tr. of Minutes, at 55:15–25, 56:14–17, 139:3–24 (Sept. 21, 2015), https://perma.cc/3EHF-7GL3. Courts must give effect to that policy choice; where the legislature "re-

ject[s]" the "very language" that would have "achieved [a particular] result," courts do not supply that result indirectly. *Hamdan* v. *Rumsfeld*, 548 U.S. 557, 579–80 (2006).

Won and her amici do not argue otherwise. They acknowledge that under the Human Rights Law, "employers are not affirmatively required to provide accommodations to caregivers." Br. for Amici Curiae A Better Balance *et al.* ("Amici Br.") 10; *see also* ASA054 (Won conceding that Amazon did "*not*" have "an independent duty to grant her a reasonable accommodation"). Instead, they attempt to obtain the same result by recasting the denial of a requested accommodation as "discriminat[ion]" in the terms and conditions of employment. Won Br. 21–22. That reframing does not save Won's claim, as explained below.

## II.   Won's Discrimination Theory Fails

Having failed to identify any "reasonable accommodation" duty under the Human Rights Law, Won attempts (Won Br. 21–22) to recast her claim as discrimination in the "terms and conditions of employment." To prevail on that theory, Won—by her own account (*id.* at 22)—must show that Amazon treated her "less well" than other employees because of her caregiver status. *Emamian* v. *Rockefeller Univ.*, 971 F.3d 380, 390 (2d

22

Cir. 2020). She cannot do so. Amazon applied the same scheduling rules to Won as to every other hourly employee at JFK8 and denied her a permanent schedule change it does not provide to anyone. Because Won was not denied access to any benefit Amazon actually offers, and because the outcome would have been the same regardless of her caregiver status, her discrimination claim fails as a matter of law.

### A. Won Was Not Treated "Less Well" Than Other Employees

Won attempts to avoid the conclusion that she was not treated "less well" than other employees in two ways. Neither succeeds.

**1.** First, Won asserts—repeatedly, and in nearly a dozen places in her brief—that Amazon offered open-ended "flexible scheduling" to other employees but denied it to her. *See* Won Br. 3, 4, 5, 16, 18, 19, 30, 31, 32. That assertion is incorrect, and in context, it underscores why her discrimination claim fails.

Amazon did not offer open-ended or individualized "flexible scheduling" to anyone at JFK8. It maintained a written scheduling policy that required fulfillment associates to work fixed shifts as part of coordinated teams performing interdependent tasks at a large, shift-based fulfillment center with set breaks. A28–29 ¶¶ 34–36; *see* SA14–19. Employees were

23

required to work their assigned shifts as scheduled, and Amazon did not permit employees to set their own hours or to vary shift start and end times on a recurring basis—changes that would disrupt end-of-shift transitions and cause employees to miss critical shift-opening meetings. *See* A150; SA14–19. Any deviations from assigned shift boundaries were permitted only to the limited extent expressly authorized by Amazon's Temporary Schedule Adjustments Policy. *See id.*

Consistent with that policy, Won herself testified that she never observed any employee work outside standard shift times or work through breaks (while others on the shift rested) to alter hours or pay. *See* A214; A257–58. And she identifies no evidence that any employee ever received any scheduling accommodation other than those permitted by policy.

Indeed, Won's claim that Amazon offered "flexible scheduling" rests solely on her own testimony that she recalls seeing a flyer that said something about "schedule accommodations"—even though she could not recall the flyer's "specific wording" or identify what scheduling options it allegedly offered. A249:12–250:8. She cites no policy, no comparator, and no instance in which any employee was permitted to arrive late or leave

24

early on a recurring basis outside Amazon's Temporary Schedule Adjustments Policy.

Under that policy, the only scheduling accommodations Amazon permitted were narrow, short-term adjustments for specified in-policy reasons. *See* SA14–19. The policy did not authorize permanent or recurring deviations from assigned shift boundaries, nor did it permit employees to maintain full pay while reducing scheduled work time or to work alone on the warehouse floor through scheduled breaks. *See id.*

The permanent schedule change Won sought—permission to arrive late (and miss the shift-opening meeting) and leave early multiple days each week while maintaining full pay by working alone through breaks— was unavailable to any employee, for any reason. Amazon would have denied the same request if made by a non-caregiver seeking to leave early for a non-policy reason. *See* A99. Because the denial turned on the nature of the request and the reason given—not on caregiver status—Won was not treated "less well" than other employees. *Emamian*, 971 F.3d at 390.

That conclusion follows directly from the Human Rights Law's causation requirement. The statute prohibits discrimination only when an

25

employee is treated less well "because of" a protected status. N.Y.C. Admin. Code § 8-107(1)(a). As the Supreme Court has explained, "because of" means that the protected characteristic must make a difference in the outcome—it must be a reason the employer acted as it did. *Bostock* v. *Clayton County*, 590 U.S. 644, 656 (2020).

Here, caregiver status made no difference at all. If two employees—caregiver and non-caregiver—had both sought a schedule deviation that fell outside Amazon's Temporary Schedule Adjustments Policy, both requests would have been denied. And had two employees—caregiver and non-caregiver—both sought a schedule adjustment that fell within that policy, both requests would have been granted. That is not disputed: Won herself admits that had she requested a schedule change for an in-policy reason, Amazon would have granted it. Won Br. 6. That concession is dispositive. Amazon's decisions—by Won's own admission—turn on whether a request complies with neutral, policy-defined criteria, not on whether the employee is a caregiver.

*Chaplin* v. *Permission Data, LLC*, 2022 WL 2916778 (N.Y. Sup. Ct., N.Y. Cnty. July 25, 2022)—the case on which Won (Won Br. 17–18, 31) and her amici (Amici Br. 29) primarily rely—illustrates the distinction

26

this case turns on. In *Chaplin*, the employer affirmatively provided caregiving-related schedule accommodations on an ad hoc basis, without an express policy, and then denied the plaintiff "'the same'" caregiver accommodation, expressly justifying the disparate treatment on the ground that the comparator employee was "a mom." 2022 WL 2916778, at \*8. Liability thus turned on the unequal distribution of an existing accommodation based entirely on a protected trait, i.e., sex—specifically, the employer's belief that women, but not men, should be responsible for childcare. *Id.*

Here, by contrast, the undisputed record shows that Amazon does not provide the type of caregiving-related schedule accommodation Won sought to anyone and applies the same neutral scheduling rules to all employees, caregiver or not. *See* A99; A601; A28–29; SA14–19. That distinction is fatal to Won's case—and it is confirmed by the very history she invokes. As the City explained in the guidance Won cites in support of her argument (Won Br. 21), the Human Rights Law prohibits discrimination because of caregiving status but "does not require employers to make special accommodations to caregivers outside the scope of company

27

policy." A629. The statute, in other words, is meant to prohibit discriminatory distribution of benefits an employer actually offers; it does not convert the uniform denial of a non-existent, out-of-policy accommodation into discrimination.

**2.** Won alternatively argues (Won Br. 6, 10, 16, 22) that because Amazon permits certain schedule adjustments for some reasons, it was required to grant her requested schedule change for caregiving. But Won's repeated invocation of "equal" and "same" treatment underscores the flaw in her argument. *Id.* at 3, 10–12, 16, 18–23, 30, 32, 34. The Human Rights Law's nondiscrimination provision guarantees "equal access" (Amici Br. 22) to the "same terms, conditions, and benefits" (Won Br. 34) that an employer actually offers; it does not require employers to extend a policy's limited exceptions to different circumstances or to create a unique individualized schedule for an employee whenever a different need is asserted.

Properly understood, the question is whether Amazon denied Won access to a scheduling option it made available to other employees. It did not. Amazon's Temporary Schedule Adjustments Policy permits only narrow, short-term timing adjustments for specified, in-policy reasons—

28

such as religious observance or an employee's own education—and applies on the same terms to all employees. *See* SA14–19. Won does not dispute that her request fell outside those criteria. She therefore was not denied the "exact same benefit" offered to others (Won Br. 19); she sought a different arrangement altogether.

Seen in that light, Won's theory proves too much. Under her view (*id.* at 22), the existence of any accommodation for any "non-caregiving reasons"—including accommodations the Human Rights Law itself expressly requires, such as for religious observance (A42 ¶ 51)—would automatically trigger a duty to provide a caregiving-based scheduling accommodation as well. *See, e.g.*, ASA054 ("[I]f Amazon never granted scheduling accommodations to *any* employees for any reason, Amazon might be correct in asserting it had no duty to grant Won's request.").

But because the statute mandates accommodations for certain non-caregiving reasons, *every* covered employer necessarily provides some accommodations to some employees for non-caregiving reasons. If providing those accommodations required extending comparable accommodations for caregiving, then *every* employer would be subject to a sweeping caregiver-accommodation mandate—the very result every party agrees

29

the statute does not impose. *Cf. id.* ("Won *does not* argue . . . that the [Human Rights Law] requires employers to provide reasonable accommodations to caregivers."). An interpretation that yields a result all parties disavow is not a plausible reading of the statute.

Subsequent enactments confirm that the City Council itself does not interpret the Human Rights Law to impose the caregiver-scheduling obligation Won advances here. When the City Council has chosen to grant caregivers scheduling or leave rights, it has done so expressly and narrowly, outside of the Human Rights Law. For example, in Int. 0780-2024, the Council amended the Earned Safe and Sick Time Act to provide employees with a bank of 32 hours of unpaid leave for childcare purposes and the right to request certain temporary schedule changes. *See* Int. 0780-2024 (effective Feb. 22, 2026). It is "highly unlikely" that the Council would enact expressly authorized, conditioned, and limited caregiver-scheduling statutes if the Human Rights Law "had already implicitly" imposed the same obligations "and more." *AMG Cap. Mgmt., LLC* v. *FTC*, 593 U.S. 67, 77 (2021). Legislatures do not enact detailed, carefully cabined caregiver-scheduling statutes to partially duplicate obligations

30

that already exist—implicitly and without limit—in a general nondiscrimination provision.

## B. Won's Remaining Objections Do Not Suggest Unequal Treatment

Unable to identify any legal error in the district court's threshold holding—that Won was not treated "less well" than other employees—Won strings together a series of additional objections. Won Br. 18–33. None compels reversal. Each objection either mischaracterizes the district court's reasoning, attacks a ruling that is legally irrelevant to the dispositive elements of her claim under the Human Rights Law, or repackages the same rejected premise that denying a nonexistent benefit is discriminatory.

***First***, the isolated workplace comments Won identifies (*id.* at 31–33) do not establish discrimination under the Human Rights Law. Comments, even "petty slight[s]," are not independently actionable unless they alter the terms, conditions, or privileges of employment or demonstrate that a challenged employment decision occurred because of a protected status. *Gittens-Bridges* v. *City of New York*, 2023 WL 8825342, at *2 (2d Cir. Dec. 21, 2023) (quoting *Mihalik* v. *Credit Agricole Cheuvreux N.A., Inc.*, 715 F.3d 102, 111 (2d Cir. 2013)); *see, e.g.*, *Lent* v. *City of New*

31

*York*, 209 A.D.3d 494, 495 (N.Y. App. Div. 1st Dep't 2022); *Tihan* v. *Apollo Mgmt. Holdings, L.P.*, 201 A.D.3d 557, 558 (N.Y. App. Div. 1st Dep't 2022). Won does not contend that the remarks themselves changed her pay, hours, duties, or benefits. Nor could she establish causation. As explained above, Amazon denied Won's request because it does not offer the schedule configuration she sought to any employee. Statements explaining the application of that neutral policy—even if perceived as "col[d]" or "dismissive" (Won Br. 31–32)—do not transform a lawful denial into discrimination "because of" caregiver status. "[D]ismissive or harsh" statements "are not actionable." *Collymore* v. *City of New York*, 2025 WL 1323784, at *3 (2d Cir. May 7, 2025).

In any event, the comments Won cites are not discriminatory on their face. Human Resources personnel explained that Amazon could not permanently alter her assigned schedule and stated that "[i]f you can't abide by the schedule, then you can't work here." Won Br. 32. That statement merely reiterated a core requirement of the position—that fulfillment associates must work their assigned shifts—and did not suggest that Won was being singled out because of her caregiver status. The

32

same is true of the alleged suggestion that Won "speak to fellow employees to inquire about possible childcare arrangements," A227:11–13, which reflects a practical effort to help Won meet fixed scheduling requirements that apply equally to all employees. Whether considered alone or in the "overall context" here, *Mihalik*, 715 F.3d at 113–14, no rational jury could find that such remarks constitute evidence of discrimination. *Cf. Golston-Green* v. *City of New York*, 184 A.D.3d 24, 43 (N.Y. App Div. 2d Dep't 2020) (affirming judgment against plaintiff who alleged "only a single comment which [was] not facially racially derogatory").

***Second***, Won's reliance on agency guidance (Won Br. 23–31) does not salvage her claim. Agency guidance is entitled to no deference where, as here, the issue is one of "pure statutory reading and analysis." *Wang* v. *James*, 227 N.E.3d 323, 327 (N.Y. 2023). That principle alone distinguishes the cases Won cites, which involve deference to agency determinations reviewed for "substantial evidence on the record," rather than questions of statutory interpretation. *State Div. of Hum. Rts. ex rel. Cottongim* v. *Cnty. of Onondaga Sheriff's Dep't*, 524 N.E.2d 123, 125 (N.Y. 1988). Nor can informal guidance override the statutory requirement that a plaintiff show she was treated "less well" because of a protected

status. Where an employer applies the same neutral rules to all employees and denies a benefit it does not provide to anyone, agency commentary cannot convert that outcome into discrimination. *See Ibhawa* v. *N.Y. State Div. of Hum. Rts.*, 252 N.E.3d 1118, 1122 (N.Y. 2024) (refusing to "accord any deference" to the Division of Human Rights' determination on a "question of law").

In any event, the guidance Won cites confirms Amazon's position. The City's own explanation of the caregiver-status amendment—relied on by Won (Won Br. 23–31)—states that under the Human Rights Law, employers "do NOT have to offer accommodations to employees because of their caregiving responsibilities," including changing shifts or allowing early departure. A609. The guidance further explains that discrimination arises only when an employer provides a benefit—such as "flexible scheduling"—and then denies "the same benefi[t]" because of caregiving responsibilities. *Id.* As discussed, however, Amazon does not offer "flexible scheduling" to any employee. *See supra*, pp. 23–25.

***Third***, Won's appeal to legislative history (Won Br. 19–23) backfires because that history relates largely to proposals that the City Council considered—and rejected—that would have imposed an affirmative

34

caregiver-accommodation requirement. The testimony she quotes at length (*id.* at 19–20) was—tellingly—submitted in 2013 in support of rejected legislative proposals by many of the same organizations appearing as amici here, urging the Council to adopt a caregiver-accommodation mandate the Council ultimately declined to enact. Legislative history is not a vehicle for re-imposing, through interpretation, obligations the legislature was asked to adopt and deliberately refused. *See Kuzmich* v. *50 Murray St. Acquisition LLC*, 132 N.E.3d 624, 630 (N.Y. 2019). Won's only other purported piece of "legislative history" (Won Br. 21)—a post-enactment City announcement—actually refutes her position. It makes clear that the statute "does not require employers to make special accommodations to caregivers outside the scope of company policy." A629.

*Fourth*, the remaining cases Won cites (Won Br. 17–18, 31) also undermine her theory rather than support it. In *Huntley* v. *City of New York*, 2024 WL 3070013 (N.Y. Sup. Ct., N.Y. Cnty. June 20, 2024), and *Palmer* v. *Cook*, 65 Misc. 3d 374 (N.Y. Sup. Ct., Queens Cnty. 2019), the denial of scheduling flexibility was not treated as independently actionable—even where "other employees were granted schedule accommodations" (Won Br. 17). Instead, the alleged scheduling denials were pleaded

as one aspect of a broader course of retaliatory or harassing conduct that purportedly altered the plaintiffs' working conditions, including reductions in compensation, hostile statements, and other adverse actions.

In *Huntley*, for example, the plaintiff alleged that she was denied "overtime, yelled at, and ultimately forced to retire," 2024 WL 3070013, at *3; in *Palmer*, the plaintiff alleged "grossly inappropriate and objectively hurtful statements" and a $6,000 reduction in pay, 65 Misc. 3d at 389. Liability in those cases thus turned on allegations of ongoing mistreatment that independently altered the plaintiffs' terms and conditions of employment—not on the denial of scheduling flexibility itself. Indeed, *Huntley* expressly acknowledged that "caregivers are not entitled to accommodations under the" Human Rights Law. 2024 WL 3070013, at *4.

***Finally***, Won's remaining objections—including her invocation of summary-judgment standards (Won Br. 12–13), burdens (*id.* at 18–19), and the "totality" of the circumstances (*id.* at 32)—cannot supply the missing elements of her claim. Those principles govern how evidence is evaluated, not whether a plaintiff has established unequal treatment or causation in the first place. Where, as here, the undisputed facts show

that the challenged decision would have been the same regardless of caregiver status, and that Won was denied only a schedule configuration Amazon does not provide to any employee, there is no triable issue for a jury to resolve.

## CONCLUSION

The judgment of the district court should be affirmed.

Dated:  February 11, 2026

Respectfully submitted,

 /s/ Jason C. Schwartz

Lauren M. Blas
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

Brian A. Richman
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698-3100

Jason C. Schwartz
Zachary B. Copeland
GIBSON, DUNN & CRUTCHER LLP
1700 M Street NW
Washington, DC 20036
(202) 955-8500
jschwartz@gibsondunn.com

*Counsel for Defendant-Appellee*
*Amazon.com Services LLC*

37

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIRE-
## MENTS, AND TYPE-STYLE REQUIREMENTS

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), (e) and Local Rule 32.1(a)(4) because:

    [X] this brief contains 6,916 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because:

    [X] this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point New Century Schoolbook font.

Dated: February 11, 2026          */s/ Jason C. Schwartz*
                                  Jason C. Schwartz

## CERTIFICATE OF SERVICE

I certify that on this 11th day of February, 2026, a true and correct copy of the foregoing brief was served on all counsel of record in this appeal via CM/ECF pursuant to Local Rule 25.1(h)(1) & (2).

*/s/ Jason C. Schwartz*
Jason C. Schwartz